UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| JAMIE A. GREENE | ) | CASE NO. 2:15-cv-02857 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE |
| vs. | ) | |
| | ) | |
| VOLKSWAGEN GROUP OF AMERICA, INC. | ) | **CLASS ACTION COMPLAINT** |
| | ) | |
| and | ) | **[JURY DEMAND ENDORSED** |
| | ) | **HEREON]** |
| VOLKSWAGEN AG | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................4

THE PARTIES ....................................................................................................4

    THE VOLKSWAGEN DEFENDANTS ...............................................4

    PLAINTIFF ...............................................................................................6

JURISDICTION AND VENUE.............................................................................6

COMMON FACTUAL ALLEGATIONS..............................................................7

    THE EPA REGULATIONS AND "DEFEAT DEVICES" .......................8

    MARKETING BY VOLKSWAGEN.......................................................10

    VOLKSWAGEN'S FRAUD ...................................................................11

TOLLING OF THE STATUE OF LIMITATIONS .............................................12

    FRAUDULENT CONCEALMENT.......................................................12

    ESTOPPEL ...............................................................................................13

    DISCOVERY RULE ...............................................................................14

CLASS TREATMENT .........................................................................................15

    CLASS AND SUBCLASS DEFINITIONS ...........................................15

    NUMEROSITY .........................................................................................16

    COMMONALITY AND TYPICALITY ...................................................17

    ADEQUACY .............................................................................................19

    PREDOMINANCE...................................................................................20

    SUPERIORITY.........................................................................................20

    DECLARATORY AND INJUNCTIVE RELIEF ...................................21

    AMALGAMATED BREACH OF CONTRACT CLAIM .........................21

COUNT I FRAUD IN THE CONCEALMENT (ON BEHALF OF THE NATIONWIDE AND SUBCLASSES)...........................................................................................30

COUNT II VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT (ON BEHALF OF THE NATIONWIDE AND SUBCLASSES) ...............................................33

COUNT III UNJUST ENRICHMENT (ON BEHALF OF THE NATIONWIDE AND SUBCLASSES)...........................................................................................38

COUNT IV VIOLATION OF THE RACKETEER INFLUENCED AND  CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1962(C) (ON BEHALF OF THE NATIONWIDE AND SUBCLASSES) ...........................................................39

    THE VOLKSWAGEN RICO ENTERPRISE.......................................39

    PATTERN OF RACKETEERING ACTIVITY .....................................42

COUNT V BREACH OF CONTRACT (ON BEHALF OF THE NATIONWIDE AND SUBCLASSES)..................................................................................................46

STATE-SPECIFIC CAUSES OF ACTION ...................................................................49

COUNT VI BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY: OHIO REV. CODE ANN. § 1302.27 (ON BEHALF OF THE STATE SUBCLASS) ..................49

COUNT VII BREACH OF EXPRESS WARRANTY: OHIO REV. CODE ANN. § 1302.88 (ON BEHALF OF THE STATE SUBCLASS) ...............................................................51

COUNT VIII OHIO CONSUMER SALES PRACTICES ACT OHIO REV. CODE ANN. § 1345.01, ET SEQ (ON BEHALF OF THE STATE SUBCLASS) ...................................52

PRAYER FOR RELIEF ...............................................................................................54

Now comes Plaintiff, on behalf of himself and all others similarly situated, and for Plaintiff's Class Action Complaint against the above-captioned Defendants, states and avers:

## INTRODUCTION

1.     This is a putative class action involving Volkswagen's deliberate, fraudulent implementation of a "defeat device" that masked a car's true emission pollution levels when being tested.

2.     Plaintiff and putative Class Members thought they purchased a car that complied with all national, state, and local laws and regulations regarding vehicle emission standards, and was an environmentally friendly car, a belief formed because Defendants claimed such in various forms of media, brochures, and point-of-sale advertising.  Instead, Plaintiff purchased two cars that fail to meet laws and regulations regarding vehicle emissions in regular use, are environmentally *unfriendly*, and pollute the environment.

3.     The Volkswagen Defendants obtained significant profits based on the premium price the Plaintiff and putative Class Members paid based on the environmentally friendly, "clean" vehicle promises the Volkswagen Defendants made.

## THE PARTIES

### *THE VOLKSWAGEN DEFENDANTS*

4.     Defendant Volkswagen AG is a foreign for-profit corporation with its principal place of business at Brieffach 11/1896 38436 Wolfsburg, Germany. Volkswagen AG, one of the world's largest car manufacturers, owns and controls the brand names Volkswagen, Rolls-Royce, Bentley, Audi, Lamborghini, Skoda and Seat. Volkswagen AG delivers its products into the stream of commerce with the expectation

4

that they will be purchased by consumers in every state in the United States. From January through June, 2015, Volkswagen AG delivered 294,992 passenger vehicles to the United States.[1]

5.     Defendant Volkswagen Group of America, Inc. is a for-profit New Jersey corporation with its principal place of business and corporate headquarters located in Virginia at located at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171. Volkswagen Group of America, Inc. is a corporation doing business in all 50 states and the District of Columbia. Volkswagen Group of America, Inc. delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in all 50 states and the District of Columbia. There are 29 Volkswagen Group of American, Inc. locations for engineering, testing, part-distribution, etc. in the United States.[2]

6.     Volkswagen Group of America, Inc. is a wholly owned subsidiary of Volkswagen AG.

7.     Defendants Volkswagen AG and Volkswagen Group of America, Inc. are collectively referred to as "Volkswagen," "the Volkswagen Defendants," and "Defendants."

---

[1] Volkswagen Facts and Figures January to June, 2015, last accessed September 22, 2015, available at
http://www.volkswagenag.com/content/vwcorp/info_center/en/publications/2015/07/Leaflet_Facts_and_Figures_January_June_2015.bin.html/binarystorageitem/file/2015_HY_Leporello_WEB_englisch.pdf

[2] See http://www.volkswagengroupamerica.com/locations.html.

*PLAINTIFF*

8.    Plaintiff **JAMIE A. GREENE** resides in Columbus, Ohio, in Franklin County, in this District.

9.    Plaintiff purchased a Defective Vehicle during the designated period.

10.    Plaintiff did not know at the time he purchased the aforementioned vehicles that they contained a "defeat device" and "switch" that masked the real level of pollutants emitted whenever the vehicle was being tested for emission levels.

11.    Plaintiff would not have purchased said vehicle, or would not have paid as much for it, if he knew of Defendants' deceptive and fraudulent trade practices. Plaintiff sustained injuries-in-fact for which he is entitled to seek monetary damages.

**JURISDICTION AND VENUE**

12.    This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. § 1332(d), this Court has original jurisdiction because the proposed Class consists of 100 or more members, the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed Class is a resident of a different state than the Defendants.

13.    This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14.    Venue is proper in this District under 28 U.S.C. § 1391 because the Defendants are subject to personal jurisdiction here, regularly conduct business in that district through dealerships and online sales, a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in

that district, and the Defendants have caused harm to class members residing in this District.

15.     The Court has personal jurisdiction over the Defendants because they are authorized to do business and in fact do business in this District, they have sufficient minimum contacts with this District, and each Defendant otherwise intentionally avails itself of the markets in this State through the promotion, marketing and sale of the subject vehicles rendering the exercise of jurisdiction by this Court permissible under this State's law and the U.S. Constitution.  The Court also has personal jurisdiction over the Defendants under 18 U.S.C. § 1965 because they are found or have agents or transact business in this District.

## COMMON FACTUAL ALLEGATIONS

16.     The Volkswagen Defendants installed "defeat devices" in certain diesel vehicles in a deliberate attempt to evade the regulations on emission testing. The Volkswagen Defendants then marketed these illegal vehicles as being "clean diesel" vehicles and sold them to consumers for a premium price.

17.     In a Notice of Violation dated September 18, 2015, the Environmental Protection Agency ("EPA") stated, "the EPA has determined that VW manufactured and installed defeat devices in certain model year 2009 through 2015 diesel light-duty vehicles equipped with 2.0 liter engines. These defeat devices bypass, defeat, or render inoperative elements of the vehicles' emission control system that exist to comply with [Clean Air Act] emission standards."[3]

18.     According to the EPA News Release, the Defective Vehicles include the:

_____

[3] See EPA Notice of Violation, dated September 18, 2015, at 1 (attached hereto as **Exhibit A**)

    a.       Volkswagen JETTA (model years 2009 – 2015);

    b.       Volkswagen BEETLE (model years 2009 – 2015);

    c.       Volkswagen GOLF (model years 2009 – 2015);

    d.       Volkswagen PASSAT (model years 2014-2015), and the

    e.       Audi A3 (model years 2009 – 2015).[4]

Discovery may reveal additional models and model year vehicles are properly included as Defective Vehicles.

19.    The Volkswagen Defendants installed these defeat devices in the Defective Vehicles in order to pass the EPA required emission testing, when in fact the Defective Vehicles emitted up to 40 times the pollution allowed by law. Worse still is that the Volkswagen Defendants heavily marketed the Defective Vehicles to consumers such as the Plaintiff and other Class Members as being "clean diesel" vehicles.

20.    Cynthia Giles, the Assistant Administrator for the Office of Enforcement and Compliance Assurance at the EPA stated: "Using a defeat device in cars to evade clean air standards is illegal and a threat to public health."[5]

21.    The Volkswagen Defendants have committed outright fraud against its consumers and the American people.

### THE EPA REGULATIONS AND "DEFEAT DEVICES"

22.    In 1963, the Environmental Protection Agency ("EPA") passed the Clean Air Act ("CAA"), which was designed to "protect and enhance the quality of the Nation's air resources so as to promote public health and welfare" and to "prevent[] and control

---

[4] See Sept. 18, 2015 EPA News Release (attached hereto as **Exhibit B**).

[5] EPA News Release, **Exhibit B**.

air pollution." CAA § 101(b)(1)-(2). Part of the aim of the CAA is to reduce nitrogen oxides and other pollutants emitted by automobiles.

23. To accomplish this goal, the EPA administers a certification program to ensure that every vehicle introduced into United States commerce satisfies applicable emission standards. Under this program, the EPA issues certificates of conformity (COCs), and thereby approves the introduction of vehicles into United States commerce.[6]

24. To obtain a COC, automobile manufacturers must submit an application that includes a list of all auxiliary emission control devices ("AECDs"). An AECD is defined as, "any element of design which senses temperature, vehicle speed, engine RPM, transmission gear, manifold vacuum, or any other parameter *for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system.* 40 C.F.R. § 86.1803-01 (emphasis added).

25. An AECD is considered a "defeat device" if it "reduces the effectiveness of the emission control system under conditions which may reasonably expected to be encountered in normal vehicle operation." 40 C.F.R. § 86.1803-01. A COC applicant must justify each AECD that reduces emission effectiveness and explain why that AECD is not a defeat device. 40 C.F.R. § 86.1844-01(d)(11).

26. Cars with defeat devices cannot be certified because the CAA makes it unlawful for:

> any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or

---

[6] EPA Notice of Violation, dated September 18, 2015, at 1, **Exhibit A**.

render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knowns or should know that such part or component is being offered for sale or installed for such use or put to such use.

CAA § 203(a)(3)(B), 40 C.F.R. § 86.1854-12(a)(3)(ii).

27.     The Volkswagen Defendants installed a defeat device into the Defective Vehicles and then concealed its existence from the EPA.

## *MARKETING BY VOLKSWAGEN*

28.     The Volkswagen Defendants have branded themselves as a company that takes affirmative action to protect the environment – as a company that cares: "At home in America and around the world, Volkswagen Group places environmental sustainability at the core of our operating philosophy. We don't just talk about it, we take action, finding inventive ways to be responsible in everything we do – and everyone, including our employees, suppliers and sales partners, is equally committed to ongoing improvements and innovations. As a result, we are on our way toward our goal of becoming the world's most environmentally sustainable automaker by 2018."[7]

29.     "[W]e are committed to driving progress through better- engineered, efficient vehicles that don't sacrifice performance. But it all starts with our vision for making cars greener than ever. We take steps to ensure that every vehicle we manufacture is the best it can be in terms of its environmental properties. We constantly

---

[7] http://www.volkswagengroupamerica.com/environment.html (last visited Sep. 22, 2015, 7:06 P.M.).

strive to improve the efficiency and economy of our engines, minimize the power consumption of electrical components and reduce the weight of our cars."[8]

30.     The Defective Vehicles emit excessive and illegal amounts of pollution when driven in real world conditions, but the Volkswagen Defendants marketed the Defective Vehicles as environmentally friendly vehicles.

## *VOLKSWAGEN'S FRAUD*

31.     Incredibly, in a deliberate attempt to evade the emissions regulations, "VW manufactured and installed software in the electronic control module (ECM) of these vehicles that sensed when the vehicle was being tested for compliance with EPA emission standards."[9] The EPA is calling this software program a "switch." During emissions testing, the software program would recognize that the vehicle was running on a dynamometer (like a treadmill for vehicles), instead of on the actual road, by analyzing various inputs such as the position of the steering wheel, vehicle speed, the duration of the engine's operation, and barometric pressure.

32.     Once it recognized the vehicle was being tested, the software would make sure the vehicle produced compliant emission results. During normal vehicle operation, however, the "switch" ran a separate calibration, called "road calibration," which reduced effectiveness of the emission control system and increased emissions of nitrogen oxides 10-40 times above EPA compliant levels.[10]

---

[8] http://www.volkswagengroupamerica.com/fuel_efficiency.html (last visited Sep. 22, 2015, 7:07 P.M.).

[9] EPA Notice of Violation, dated September 18, 2015, at 3, **Exhibit A**.

[10] Id., at 4.

33.    The Volkswagen Defendants' "road calibration" and "switch" are illegal "defeat" devices.  According to the EPA, the Defective Vehicles do not conform to the specifications described in Volkswagen's COC application.   The Volkswagen Defendants, therefore, violated the CAA each time it introduced a Defective Vehicle into commerce.[11]

34.    The EPA and the California Air Resources Board presented emission reports to the Volkswagen Defendants, which culminated in a voluntary software recall in December 2014. Yet this recall failed to remediate the pollution problem as nitrogen oxides emissions were still "significantly higher" than expected during CARB's testing.[12] Moreover, the Volkswagen Defendants failed to adequately explain the poor performance under the CARB testing.

35.    Only when it became clear that the EPA and the California Air Resources Board would not approve certificates of conformity for the Volkswagen Defendants' 2016 model year diesel cars, did the Volkswagen Defendants "admit that it designed and installed a defeat devices in these vehicles in the form of a sophisticated software algorithm that detected when a vehicle was undergoing emissions testing."[13]

## **TOLLING OF THE STATUE OF LIMITATIONS**

### *FRAUDULENT CONCEALMENT*

36.    The Volkswagen Defendants knew of the defects described in this Complaint since at least 2009.

---

[11] Id.

[12] CARB Letter, dated September 18, 2015: "Re: Admission of Defeat Device and California Air Resources Board's Requests," at 2.

[13] EPA Notice of Violation, dated September 18, 2015, at 4, **Exhibit A**.

37. The Volkswagen Defendants knew of the defects before Plaintiff and Class Members purchased the Defective Vehicles, and have concealed from or failed to notify Plaintiff, Class Members, and the public of the full and complete nature of the defects.

38. The Volkswagen Defendants intentionally concealed, did not fully investigate, or consciously failed to investigate the seriousness of, the defect, including concealing the defect and/or its seriousness from the public, from the Plaintiff and from the Class until September 2015.

39. Instead of disclosing its scheme, that the quality and quantity of emissions from the subject vehicles were far worse than represented, or its disregard of federal and state law, The Volkswagen Defendants falsely represented that its vehicles complied with federal and state emissions standards, that it was a reputable manufacturer whose representations could be trusted, and that the subject vehicles were environmentally friendly under normal driving conditions.

40. Any applicable statute of limitations has been tolled by Defendants' knowledge and active concealment from Plaintiff and the Class Members of these facts.

### *ESTOPPEL*

41. The Volkswagen Defendants were and are under a continuing duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the vehicles.

42. The Volkswagen Defendants actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles.

43.    The Volkswagen Defendants were and are under a continuous duty to disclose to Plaintiff and Class Members that they engaged a scheme to evade federal and state emissions and clean air standards, and that it systematically devalued compliance with, and deliberately violated, federal and state laws and regulations covering vehicle emissions and clean air.

44.    Plaintiff and Class Members reasonably relied upon The Volkswagen Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts.

45.    The Volkswagen Defendants are estopped from relying on any statutes of limitation in defense of this action.

### DISCOVERY RULE

46.    Plaintiff and Class Members did not, nor with reasonable diligence could have, discovered their vehicles were defective, or the nature or extent of the Volkswagen Defendants' scheme, until at the earliest September, 2015.

47.    Class Members had no way of knowing about the Volkswagen Defendants' deception with respect to its vehicles and "defeat device."

48.    The Volkswagen Defendants' deception involved sophisticated manipulation of the vehicles' software and / or firmware that rendered the actual emissions undetectable under normal emissions testing, and discovery of which required special testing tools and methods used or created by state and federal agencies to uncover.

49.    The Volkswagen Defendants' intent was to hide its behavior from regulators and consumers.

50.     Within the time period of any applicable statutes of limitation, Plaintiff and Class Members could not have discovered through the exercise of reasonable diligence the defects or that the Volkswagen Defendants were concealing the defects

51.     Plaintiff and Class Members did not discover, and did not know of facts that would have caused a reasonable person to suspect, the defects, or that Volkswagen did not report information within its knowledge to federal and state authorities, its dealerships, or consumers.

52.     A reasonable and diligent investigation by any consumer would not have disclosed the defect, the Volkswagen Defendants' scheme, or that the Volkswagen Defendants had information in their possession about the existence of its sophisticated emissions scheme that they intentionally concealed.

**CLASS TREATMENT**

53.     Plaintiff brings this action under Federal Rule of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) on behalf of herself and members of the Nationwide Class and State Subclass.

*CLASS AND SUBCLASS DEFINITIONS*

54.     The "Nationwide Class" is defined as:

**All persons or entities in the United States who purchased or leased one or more Defective Vehicles in the United States.**

55.     The "State Subclass" is defined as:

**All persons or entities who purchased or leased one or more Defective Vehicles in the State of Ohio.**

56.     Excluded from the Nationwide Class and State Subclass are:

a.    individuals who have suffered personal injury as a result of the claims made herein;

b.    all persons who make a timely election to be excluded from the Class;

c.    the Volkswagen Defendants, their subsidiaries and affiliates;

d.    governmental entities;

e.    the judge to whom this case is assigned, their staff, and their immediate family.

57.    Plaintiff reserves the right to revise the Class and Subclass definition if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

58.    The Class Definitions are precisely defined such that a person's membership in the Class is readily ascertainable by reference to the Defendants' own data and records.  There is no reliance or other individualized showing for a particular customer to meet the Class Definitions.  The proposed Class Definition are therefore precise, objective, and presently ascertainable.

59.    In cases where the amount of Class or Subclass Member damages is ascertainable, but the identity of the person is not, the funds should be allocated to an appropriate consumer advocacy or environmental protection nonprofit under the *cy pres* doctrine.

## *NUMEROSITY*

60.    The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable.

16

61.     The precise number of Class Members can be readily determined from the Volkswagen Defendants' records.

62.     Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

63.     The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.

*COMMONALITY AND TYPICALITY*

64.     This is a case of a systemic scheme by the Defendants that harmed each class member through the same conduct, in the same way.

65.     Common questions of law and fact exist as to all members of the Classes. These questions predominate over questions that may affect only individual class and subclass members because Defendants have acted on grounds generally applicable to the Classes.  Such common legal or factual questions include:

a.      Whether the Volkswagen Defendants engaged in the conduct alleged herein;

b.      Whether the Volkswagen Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed Defective Vehicles into the stream of commerce in the United States;

c.      Whether the Defective Vehicles contain a defect in that it does not comply with United States EPA requirements;

d.      Whether the engine systems in Defective Vehicles can be made to comply with EPA standards without substantially degrading the performance and/or efficiency of the Defective Vehicles;

e.      Whether the Volkswagen Defendants knew about the "defeat device" and, if so, how long the Volkswagen Defendants have known;

f.   Whether the Volkswagen Defendants designed, manufactured, marketed, and distributed Defective Vehicles with a "defeat device";

g.   Whether the Volkswagen Defendants' conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

h.   Whether Defendants knew or reasonably should have known about the defects after distributing the Defective Vehicles to Plaintiff and the Class Members;

i.   Whether Defendants breached express warranties relating to the Defective Vehicles;

j.   Whether Defendants breached the implied warranty of merchantability relating to the Defective Vehicles;

k.   Whether Defendants engaged in unfair, unconscionable, or deceptive trade practices in connection with the sale and/or marketing of the Defective Vehicles.

l.   Whether Defendants were unjustly enriched by receiving moneys in exchange for the Defective Vehicles;

m.   Whether Defendants should be ordered to disgorge all or part of the ill-gotten profits it received from the sale of the Defective Vehicles;

n.   Whether Defendants should be enjoined from selling and marketing its Defective Vehicles; and

o.   Whether the value of the Defective Vehicles has diminished as a result of their defects;

p.   Whether the Plaintiff and the other Class Members overpaid for their Defective Vehicles;

q.   Whether Plaintiff and the other Class Members are entitled to equitable relief, including restitution or injunctive relief; and

r.   Whether Plaintiff and the other Class Members are entitled to damages and other monetary relief and, if so, in what amount.

s.   Whether Plaintiff and the Class Members are entitled to damages, including compensatory, exemplary and statutory damages, and the amount of such damages;

t.   Whether Plaintiff and the Class Members are entitled to equitable relief or any other relief, as well as the nature of such relief;

66.     Because the Volkswagen Defendants' conduct is uniform across Class Members nationwide, the legal issues will be common across the Class.  The common questions of fact and law will have common answers throughout the Class.

67.     For the same reason, the defenses will be common across the Class.

68.     The Plaintiff has the same claims as the class members arising from the same course of conduct by the Defendants, making her claims typical of the class.  The representative Plaintiff, like all Class Members, has been damaged by the Volkswagen Defendants' misconduct in that she has incurred losses relating to the defeat devices and Defendants' misrepresentations and concealments.

69.     The factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

70.     The relief Plaintiff seeks is typical of the relief sought for the absent Class members.

## *ADEQUACY*

71.     Plaintiff is intelligent, understand the claims, is able to represent the interests of the Classes, and her interests are aligned with those of the Class's.  The interests of Plaintiff is not antagonistic to the Class's.

72.     The Plaintiff is part of the class (having purchased the subject vehicles) and possess the same interest and suffers the same injury as the class members.

73.     Plaintiff has chosen attorneys who are experienced in class action litigation, including on a nationwide basis, breach of contract claims, breach of warranty claims, the other claims alleged herein, and complex commercial litigation practices.

74.    The Spangenberg Shibley & Liber Law Firm and its attorneys have handled complex litigation including class actions and mass tort cases.  Spangenberg attorneys have served as lead counsel and liaison counsel in mass tort actions.  The Spangenberg law firm has financed complex litigation and contingency litigation for more than 70 years.  The Spangenberg law firm has a national reputation.

75.    Counsel and the Class representatives will adequately and diligently pursue the interests of the Class.

<u>PREDOMINANCE</u>

76.    Issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof.

77.    The common questions of law and fact described above are the most significant questions for the class action, the resolution of which will resolve the claims for each class member.

78.    There are no individualized inquiries required for the claims or defenses.

<u>SUPERIORITY</u>

79.    Class action treatment is a superior method for the fair and efficient adjudication of this controversy, in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender.

80.    The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to

pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

81.    Absent a class action, most Class Members would likely find the cost of litigating their individual claims prohibitively high and have no effective remedy at law. Because the damages suffered by each individual Class member may be relatively small compared to the expense and effort of litigation against a large, international car manufacturer, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous.  Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.

82.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

### *DECLARATORY AND INJUNCTIVE RELIEF*

83.    Defendants have acted or refused to act on grounds generally applicable to the class and subclasses, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class and subclass as a whole.

### *AMALGAMATED BREACH OF CONTRACT CLAIM*

84.    Breach of contract claims across all 50 states consist of substantively identical standard elements, making a claim based on a single contract ideal for class certification.  See, e.g., Kleiner v. First Nat. Bank of Atlanta, 97 F.R.D. 683, 692 (N.D.Ga.1983) ("When viewed in light of Rule 23, claims arising from interpretations of a

form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such.") (citing Broad v. Rockwell Intern. Corp., 642 F.2d 929 (5th Cir.) (en banc) cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981) (breach of indenture agreement); Irving Trust Co. v. Nationwide Leisure Corp., 95 F.R.D. 51 (S.D.N.Y.1982) (breach of contract for failure to provide charter tour services); Jennings Oil Co., Inc. v. Mobil Oil Corp., 80 F.R.D. 124 (S.D.N.Y.1978) (validity of general release provision of contract); Davis Cattle Co. v. Great Western Sugar Co., 393 F.Supp. 1165 (D.Col.1975) (breach of contract); Janicik v. Prudential Insurance Co. of America, ——Pa.Super.Ct. ——, 451 A.2d 451 (1982) (interpretation of form insurance contract); Derenco, Inc. v. Benj. Franklin Fed. Sav. & Loan Assn., 281 Or. 533, 577 P.2d 477 (1978) (form mortgage); Buchanan v. Brentwood Federal Savings and Loan Assn., 457 Pa. 135, 320 A.2d 117 (1974) (form contract); Perlman v. First National Bank of Chicago, 15 Ill.App.3d 784, 305 N.E.2d 236 (1st Dist.1973) (360-day year method of computing interest); Georgia Investment Co. v. Norman, 229 Ga. 160, 190 S.E.2d 48 (1972) (validity of loan note); Silverstein v. Shadow Lawn Sav. & Loan Assn., 51 N.J. 30, 237 A.2d 474 (1968) (breach of contract based on method of calculating interest).

85.    Each state requires the following elements to prove a breach of contract claim: (1) a contract; (2) Plaintiff's performance; (3) Defendant's breach of the contract; and (4) damages proximately caused by the defendant's breach.  See, e.g.:

        a.    [AL] State Farm Fire & Casualty Co. v. Slade, 747 So. 2d 293, 303 (Ala. 1999) (""The elements of a breach of contract claim under Alabama law are as follows: (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.")

b.      [AK] <u>Fleenor v. Church</u>, 681 P.2d 1351, 1354 & n.4 (Alaska 1984) (noting that although "courts of equity do not require literal performance of all acts required to be done under the contract" in order for equitable relief to be granted, "under ordinary circumstances, [plaintiff] would be barred from enforcing [defendant's] duty to perform, since she had not fulfilled her own concurrent contractual obligation.") (citing <u>Navato v. Sletten</u>, 560 F.2d 340, 346 (8th Cir. 1977) ("It is axiomatic that before a party can recover upon a contract, she must show her own performance or her own tender thereof.");  <u>Native Village of Stevens v. Alaska Management & Planning</u>, 757 P.2d 32, 42-43 (Alaska 1988) (requiring plaintiff to prove existence of valid, enforceable contract in order to maintain action for breach of contract); <u>Winn v. Mannhalter</u>, 708 P.2d 444, 450 (Alaska 1985) (Damages resulting from the breach a required element in an action for breach of contract).

c.      [AZ] <u>Graham v. Asbury</u>, 112 Ariz. 184, 185 (1975) ("To bring an action for the breach of the contract, the plaintiff has the burden of proving the existence of the contract, its breach and the resulting damages.");

d.      [AR] <u>Ultracuts Ltd v. Wal-mart Stores, Inc.</u>, 343 Ark. 224, 231-32 (2000) (""A person may be liable for breach of contract if the complaining party can prove the existence of an agreement, breach of the agreement, and resulting damages.");

e.      [CA] <u>Reichert v. General Ins. Co.</u>, 68 Cal. 2d 822, 830 (1968) ("[T]she essential elements of . . . a cause of action [for breach of contract are]: (1) the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach, and (4) the resulting damages to plaintiff.");

f.      [CO] <u>Western Distrib. Co. v. Diodosio</u>, 841 P.2d 1053, 1058 (Colo. 1992) ("It has long been the law in Colorado that a party attempting to recover on a claim for breach of contract just prove the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance, (3) failure to perform the contract by the defendant, and (4) resulting damages to the plaintiff.") (citations omitted);

g.      [CT] <u>Chem-Tek, Inc. v. General Motors Corp.</u>, 816 F. Supp. 123, 131 (D.Conn. 1993), ("In pleading an action for breach of contract, plaintiff must plead: 1) the existence of a contract or agreement; 2) the defendant's breach of the contract or agreement; and 3) damages resulting from the breach.") (applying Connecticut law);

23

h.  [DE] Winston v. Mandor, 710 A.2d 835, 840 (Del.Chan. 1997) (For a breach of contract claim, "plaintiff must demonstrate the existence of the contract, breach thereof and resultant damage.");

i.  [DC] Proctor v. Ward, 83 A.2d 281, 282 (D.C. 1951) (complaint stated the elements of breach of contract where plaintiff alleged: (1) existence of a contract; (2) performance by plaintiff; (3) failure to perform by defendant; and (4) damages caused by the breach);

j.  [FL] Abbott Lab., Inc. v. GE Capital, 765 So. 2d 737, 740 (Fla. 5th DCA 2000) ("The elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages.");

k.  [GA] Budget Rent-A-Car v. Webb, 220 Ga. App. 278, 279 (1996) ("The elements of a right to recover for a breach of contract are the breach and the resultant damages to the party who has the right to complain about the contract being broken.");

l.  [HI] Uyemura v. Wick, 57 Haw. 102, 110-11 (1976) (contract, breach, damages, but nominal damages presumed);

m.  [ID] Mosell Equities, LLC. v. Berryhill & Co., Inc., 154 Idaho 269, 278 (Idaho 2013) ("The court cannot grant a judgment as to one element of a claim for relief. The elements for a claim for breach of contract are: a) the existence of the contract; b) the breach of the contract; c) the breach caused damages; and d) the amount of those damages." (citing O'Dell v. Basabe, 119 Idaho 796, 813 (1991);

n.  [IL] Henderson-Smith & Assocs. v. Nahamani Family Serv. Ctr., 323 Ill. App. 3d 15, 27 (2001) ("The elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff.")

o.  [IN] Rogier v. American Testing & Eng'g Corp., 734 N.E.2d 606, 614 (Ind. Ct.App. 2000) ("The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages.");

p.  [IA] Berryhill v. Hatt, 428 N.W.2d 647, 652 (Iowa 1988) ("[T]she following elements are necessary [] to show a breach of contract: (1) the existence of the contract; (2) the terms and conditions of the contract; (3) that the buyers have performed all the terms and conditions of the contract required of them to now require the [defendant] to perform; (4) that the contract was breached in some particular way; and (5) that the [plaintiff] has suffered damages.");

q.      [KS] <u>Commercial Credit Corp. v. Harris</u>, 212 Kan. 310, 313 (1973) ("In an action based on a contract, the burden of proof is on the plaintiff to show: (I) execution and existence of the contract alleged in the petition; (2) sufficient consideration to support the contract; (3) performance or willingness to perform in compliance with the contract alleged; and (4) the defendant's breach insofar as such matters are in issue.");

r.      [KY] <u>Peters Branch Int'l Shoe Co. v. Jones</u>, 247 Ky. 193, 197 (1933) ("In  order to constitute a cause of action in a case like this [for breach of contract], the pleading must not only state the contract and its breach, but must allege the damage sustained by reason of the breach.");

s.      [LA] <u>Lester Frame v. Comeaux</u>, 735 So. 2d 753, 756 (La. App. 1999) (contract, breach, damages);

t.      [ME] <u>Anderson v. Eastern Coupling Co.</u>, 108 Me. 374, 376 (1911) (ruling that plaintiff properly pled a cause of action for breach of contract upon showing (1) the existence of a contract; (2) plaintiff's performance, (3) defendant's breach; and (4) damages.);

u.      [MD] <u>Taylor v. Nationsbank, N.A.</u>, 365 Md. 166, 175 (Md. App. 2001) ("To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation…It is not necessary that the plaintiff prove damages resulting from the breach, for it is well settled that where a breach of contract occurs, one may recover nominal damages even though she has failed to prove actual damages.");

v.      [MA] <u>Yellin v. Hyman, P.C. v. Ellis & Assocs.</u>, 2001 Mass. Super LEXIS 232, *10 (2001) ("To succeed in a breach of contract action, a claimant must demonstrate (1) that the parties reached a valid and binding agreement, (2) that one party breached the terms of the agreement, and (3) that the other party suffered damages from the breach.");

w.      [MI] <u>Malcolm MacDowell & Associates, Inc. v. Ecorse-Lincoln Park Bank</u>, 325 Mich. 591, 598 (1949) ("[P]laintiff did declare on an express agreement, alleging performance thereof by itself and breach by defendant with resultant damage to plaintiff.  Those allegations, standing alone, were sufficient, if proved, to support a judgment for plaintiff.");

x.      [MN] <u>Industrial Rubber Applicators, Inc. v. Eaton Metal Prods. Co.</u>, 285 Minn. 511, 513 (1969) ("In an action on a contract such as this

the elements would be (a) the formation of the contract; (b) performance by plaintiff of any conditions precedent to her right to demand performance by defendant; and (c) a breach of the contract by defendant.");

y.   [MS] <u>Frierson v. Delta Outdoors, Inc.</u>, 794 So. 2d 220, 226 (Miss. 2001) (requiring, for a breach-of-contract action, a showing of (1) a valid contract, (2) breach of that contract, and (3) damages);

z.   [MO] <u>White v. Pruiett</u>, 39 S.W. 3d 857, 861-62 (Mo. App. 2001) ("In order to make a submissible case of breach of contract, contractor was required to establish: (1) the existence of a valid contract; (2) the rights and obligations of the respective parties; (3) a breach; and (4) damages.");

aa.  [MT] <u>Tobacco River Lumber Co., Inc. v. Yoppe</u>, 176 Mont. 267, 270 (1978) ("Here, plaintiff set out the relevant terms of the contract in its complaint and alleged that defendants [breached].  Plaintiff also set out three specific ways in which it was damaged by the alleged breach and had a prayer of damage for each claim. We do not feel that more is required to state a claim [for breach of contract].");

bb.  [NE] <u>Vowers & Sons, Inc. v. Strasheim</u>, 254 Neb. 506, 516-17 (1998) ("[I]n order to recover for breach of contract a plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that actuate the defendant's duty.");

cc.  [NV] <u>Orr Water Ditch Co. v. Reno Water Co.</u>, 19 Nev. 60, 65 (1885) (holding that the facts alleged-- contract, breach, and damages -- constituted a cause of action for breach of contract);

dd.  [NH] <u>Bronstein v. GZA Geoenvironmental, Inc.</u>, 140 N.H. 253, 255 (1995) ("[A] cause of action….arises once all the necessary elements are present…In the case of a contract action, it would be when the breach occurs.  A breach of contract occurs when there is a failure without legal excuse, to perform any promise which forms the whole or part of a contract.");

ee.  [NJ] <u>John Hancock Mut. Life. Ins. Co. v. King</u>, 1997 WL 373512, *3 (D.N.J. 1997) (applying New Jersey law) ("John Hancock has pleaded the existence of a [contract]. . . . In addition, John Hancock has pleaded that King breached particular provisions of the [agreement], and that John Hancock has suffered damages as a result of King's activities. . . .These pleadings are . . . sufficient to establish John Hancock's claim for breach of contract under New Jersey [law].").

26

ff.   [NM] <u>Camino Real Mobile Home Park Partnership v. McCarson</u>, 119 N.M. 436, 445 (1995) ("Once a party has established a cause of action for breach of contract by showing the existence of a contract, breach thereof, causation, and actual damage, she or she may be awarded nominal damages and costs, even when failing to establish the amount of compensatory damages.");

gg.   [NY] <u>WorldCom, Inc. v. Sandoval</u>, 701 NY.S.2d 834, 836 (N.Y. Sup. Ct. 1999) ("An action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.");

hh.   [NC] <u>Claggett v. Wake Forest Univ.</u>, 126 N.C. App. 602, 608 (1997) ("To state a claim for breach of contract, the complaint must allege that a valid contract existed between the parties, that defendant breached the terms thereof, the facts constituting the breach, and that damages resulted from such breach.");

ii.   [ND] <u>Jones v. Grady</u>, 62 N.D. 312, 318, 243 N.W. 743, 745 (1932) (finding that a complaint properly states a cause of action for breach of contract where it "recites facts showing the contract, performance by the plaintiffs, breach by the defendants, and concludes with a general allegation of damages.");

jj.   [OH] <u>Garofalo v. Chicago Title Ins. Co.</u>, 104 Ohio App. 3d 95, 661 N.E. 2d 218, 226 (1995) ("Generally, a breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the non breaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the non breaching party suffered damages as a result of the breach.");

kk.   [OK] <u>Digital Design Group, Inc. v. Information Builders, Inc.</u>, 24 P.3d 834, 843 (Okla. 2001) ("In order to recover on its breach of contract theory, [plaintiff] needed to prove: 1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach.");

ll.   [OR] <u>Slover v. Oregon State Bd. Of Clinical Social Workers</u>, 144 Or. App. 565, 570 (1996) ("To state a claim for breach of contract, plaintiff must allege the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach and defendant's breach resulting in damage to plaintiff.");

mm.   [PA] <u>CoreStates Bank N.A. v. Cutillo</u>, 723 A.2d 1053, 1058 (Pa. Super. 1999) (To establish a claim for breach of contract, a claimant must show "(1) the existence of a contract, including its

essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.");

nn. [RI] <u>Konoff v. Lantini</u>, 111 R.I. 691, 696, 306 A.2d 176, 179 (1973) (contract, breach, damages);

oo. [SC] <u>Fuller v. Eastern Fire & Casualty Ins. Co.</u>, 240 S.C. 75, 89, 124 S.E.2d 602, 610 (1962) ("This being an action for breach of contract, the burden was upon the [insured] to prove the contract, it's breach, and the damages caused by such breach.");

pp. [SD] <u>McKie v. Huntley</u>, 620 N.W.2d 599, 603 (S.D. 2000) ("An action for breach of contract requires proof of an enforceable promise, its breach, and damages.");

qq. [TN] <u>Tedder v. Raskin</u>, 728 S.W.2d 343, 351 (Tenn App. 1987) (Under the law of Tennessee, the essential elements of a breach of contract claim are the existence of a contract, breach of that contract, and injuries or damages proximately caused by the breach.");

rr. [TX] <u>Frost Nat'l Bank v. Burge</u>, 29 S.W.3d 580, 598 (Tex.Civ.App. 14th Dist. 2000) ("The essential elements in a breach of contract claim are as follows: (1) the existence of a valid contract; (2) that the plaintiff performed or tendered performance; (3) that the defendant breached the contract; and (4) that the plaintiff was damaged as a result of the breach.");

ss. [UT] <u>Bair v. Axiom Design</u>, LLC., 20 P.3d 388, 392 (Utah 2001) ("The elements of a prima facie case for breach of contract are (1) a contract; (2) performance by the party seeking recovery, (3) breach of contract by the other party, and (4) damages.");

tt. [VT] <u>Lapoint v. Dumont Const. Co.</u>, 128 Vt. 8, 10, 258 A.2d 570 (1969) ("In the obligation assumed by a party to a contract is found her duty, and her failure to comply with the duty constitutes a breach….A contract includes not only what is expressly stated therein but also what is necessarily implied from the language used.");

uu. [VA] <u>Westminster Investing Corp. v. Lamps Unlimited, Inc.</u>, 237 Va. 543, 379 S.E.2d 316 (Va. 1989) ("The elements of a breach of contract claim under Virginia law are (1) a legal obligation of a defendant to a plaintiff; (2) a violation or breach of that duty; and (3) consequential injury or damage to the plaintiff.");

vv. [WA] <u>Northwest Indep. Forsest Mfrs. v. Dep't of Labor & Indus.</u>, 78 Wash. App. 707, 712 (1995) ("A breach of contract is actionable

only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant.");

ww. [WV] <u>Mason County Bd. Of Educ. v. State Superintendent of Sch.</u>, 170 W. Va. 632, 636, 295 S.E.2d 719, 724 (1982) (in a case seeking damages for alleged breach of contract, the plaintiff may rest her case upon proof of a valid contract and its breach);

xx. [WI] <u>Discount Fabric House, Inc. v. Wisconsin Tel. Co.</u>, 117 Wis. 2d 587, 603, 345 N.W.2d 417, 425 (1984) (recognizing the elements of a breach of contract action as a contract, breach of the contract and damages); and

yy. [WY] <u>Reynolds v. Tice</u>, 595 P.2d 1318, 1323 (1979) ("The elements for a breach of contract claim consist of a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised therein, and entitlement of injured party to damages... This is often stated, as the court here instructed, as failure without legal excuse to perform any promise which forms the whole or part of a contract.").

## COUNT I
## FRAUD IN THE CONCEALMENT
## (ON BEHALF OF THE NATIONWIDE AND SUBCLASSES)

86.     Plaintiff incorporates all other paragraphs of this Complaint as if fully rewritten herein.

87.     Plaintiff brings this Count on behalf of the Nationwide Class and on behalf of the Subclass(es) as defined separately if a Nationwide Class is not certified.

88.     Defendants have fraudulently and falsely represented that the Defective Vehicles use the "clean diesel" technology, and refer to their engines as "TDI Clean Diesel," in a manner that the vehicles comply with EPA emission standards, and federal, state, and local emission and pollution standards, laws, and regulations.

89.     Defendants knowingly made false representations or material omissions regarding the nature of the Defective Vehicles.

90.     Defendants concealed and suppressed material facts concerning the nature of the Defective Vehicles, including:

      a.     Defendants knew that the Defective Vehicles were designed and manufactured with illegal defeat devices, but Defendants concealed those material facts.

      b.     Defendants recklessly manufactured and distributed the Defective Vehicles to consumers in the United States, even though Defendants knew, or should have known, at the time of distribution, that the Defective Vehicles contained such defects.

      c.     Plaintiff and Class Members had no knowledge of these defects at the time they purchased or leased the Defective Vehicles.

91.     Plaintiff and Class Members' Defective Vehicles were, in fact, defective at the time of purchase or lease.

92.     The Volkswagen Defendants engaged in a scheme to evade federal and state vehicle emissions standards by installing software designed to conceal the vehicles' emissions of the pollutants that contribute to the creation of ozone and smog. The software installed on the vehicles at issue was designed to change the vehicle's engine performance during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road. The result was what the Volkswagen Defendants intended: vehicles passed emissions certifications by way of deliberately induced false readings. The Volkswagen Defendants' deliberate, secret scheme resulted in noxious emissions from these vehicles at many times applicable standards.

93.     Defendants had a duty to disclose these material defects to Plaintiff, Class Members, the public, and the EPA, but failed to do so.

94.     Defendants had a duty to disclose the true facts about the Defective Vehicles because Defendants had superior knowledge and access to those facts, and the facts were not known to or reasonably discoverable by Plaintiff and Class Members.

95.     The Volkswagen Defendants also took steps to ensure their employees did not reveal the details of the scheme to regulators or consumers, including Plaintiff and the Nationwide Class members. The Volkswagen Defendants did so in order to boost the reputation—and price—of their vehicles, falsely assure purchasers and lessors of their vehicles, including certified previously owned vehicles, that the Volkswagen Defendants are reputable manufacturers that comply with applicable law,

including federal and state clean air law and emissions regulations, and that the vehicles likewise comply with applicable law and regulations.

96.     The Volkswagen Defendants' false representations were material to consumers, both because they concerned the quality of the Defective Vehicles, including their compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As the Volkswagen Defendants well knew, their customers, including Plaintiff and Nationwide Class Members, highly valued that the vehicles they were purchasing or leasing were clean diesel cars, and they paid accordingly.

97.     Defendants knew that Plaintiff and Class Members had no knowledge of the illegal defeat devices in the Defective Vehicles, and that neither Plaintiff nor the other Class Members had an equal opportunity to discover the facts to inform them of those defects.

98.     Plaintiff and Class Members trusted Defendants not to sell or lease vehicles to them that were defective, violated the Clean Air Act or other laws and regulations regarding pollution and vehicle emissions, or not ecologically friendly.

99.     Plaintiff and Class Members reasonably relied on Defendants' representations that the vehicles they were purchasing, leasing, and/or retaining were free from defects and complied with Defendants' representations and warranties.

100.    The concealment was material, because if the true facts had been disclosed, Plaintiff and Class Members would not have bought, leased or retained their vehicles, or would not have paid the premium for them.

101.   The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle.

102.   Defendants each knew or recklessly disregarded that their representations and/or statements regarding the Defective Vehicles were false.

103.   As a direct and proximate result of Defendants' knowingly false representations, concealment, and suppression of facts, Plaintiff and Class Members have sustained and will continue to sustain damages, including the difference between the actual value of that which Plaintiff and the Classes paid and the actual value of that which they received.

104.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being to enrich Defendants.

105.   Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT II**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**(ON BEHALF OF THE NATIONWIDE AND SUBCLASSES)**

106.   Plaintiff incorporates all other paragraphs of this Complaint as if fully rewritten herein.

107.   Plaintiff brings this Count on behalf of the Nationwide Class and on behalf of the Subclass(es) as defined separately if a Nationwide Class is not certified.

108.   The Defective Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301.

109. Plaintiff and Class Members are "consumers" within the meaning of 15 U.S.C. § 2301. They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

110. Defendants are "suppliers" of the consumer products to consumers and "warrantors" within the meaning of 15 U.S.C. § 2301.

111. Defendants made written and implied warranties regarding the Defective Vehicles to Plaintiff and Class Members within the meaning of 15 U.S.C. § 2301.

112. Defendants provided Plaintiff and Class Members with express and implied warranties of merchantability in connection with the purchase or lease of their vehicles that are warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

113. Defendants warranted that the Defective Vehicles were eco-friendly and fit for their ordinary purpose as passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

114. Defendants violated the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., by failing to comply with the written and implied warranties made to Plaintiff and Class Members.

115. Defendants breached these warranties, and are therefore liable to Plaintiff and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Defective Vehicles share common defects in that they are equipped with defeat devices.

34

Defendants have admitted that the Defective Vehicles are defective in issuing its recalls, but the recalls are woefully insufficient to address each of the defects.

116. In their capacity as warrantors, as Defendants had knowledge of the inherent defects in the Defective Vehicles, any efforts to limit the implied warranties in a manner that would exclude coverage of the Defective Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Defective Vehicles is null and void.

117. The limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between Defendants and Plaintiff and the other Class Members, as, at the time of purchase and lease, Plaintiff and the other Class Members had no other options for purchasing warranty coverage other than directly from Defendants.

118. The limitations on the warranties are substantively unconscionable. Defendants knew that the Defective Vehicles were defective. Defendants failed to disclose these defects to Plaintiff and Class Members. Thus, Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

119. Plaintiff Class Members have had sufficient direct dealings with Defendants or their agents (dealerships) to establish privity of contract. Nonetheless, privity is not required here because Plaintiff and Class Members are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the

Defective Vehicles; the warranty agreements were designed for and intended to benefit consumers.

120.   Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and are not required to give Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

121.   Affording Defendants an opportunity to cure their breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Defective Vehicle, Defendants knew, should have known, or were reckless in not knowing of their misrepresentations concerning the Defective Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resorts to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

122.   Plaintiff and Class Members would suffer economic hardship if they returned their Defective Vehicles but did not receive the return of all payments made by them.

123.   Because Defendants have no available cure, Plaintiff and Class Members have not re-accepted their Defective Vehicles by retaining them.

124.   Plaintiff and Class Members sustained injuries and damages as a direct and proximate result of Defendants' violation of their written and/or implied warranties.

125.   Pursuant to 15 U.S.C. § 2310(d)(3), the amount in controversy of Plaintiff's and each Class Member's individual claim exceeds the sum of $25. The total amount in controversy in this Class action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. The size of each plaintiff class or subclass far exceeds 100 members but the precise number of class members is entirely within the defendants' knowledge and control.

126.   Plaintiff, individually and on behalf of the other Class Members, seeks all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and Class Members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff and Class Members in connection with the commencement and prosecution of this action.

127.   Plaintiff and the Class Members are entitled to equitable relief under 15 U.S.C. § 2310(d)(1). Based on Defendants' continuing failures to fix the known defects, Plaintiff seeks a declaration that Defendants have not adequately implemented their recall commitments and requirements and general commitments to fix its failed processes, and injunctive relief in the form of judicial supervision over the recall process is warranted. Plaintiff also seeks the establishment of a Defendant-funded program for Plaintiff and Class Members to recover out-of-pocket costs incurred.

128.   Plaintiff also requests, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs she has incurred in attempting to rectify the defects. Such expenses and losses will continue as Plaintiff and Class Members must

take time off from work, pay for rental cars or other transportation arrangements and expenses involved in going through the recall process.

129.   The right of Class Members to recover these expenses as an equitable matter to put them in the place they would have been but for Defendants' conduct presents common questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

### COUNT III
### UNJUST ENRICHMENT
### (ON BEHALF OF THE NATIONWIDE AND SUBCLASSES)

130.   Plaintiff incorporates all other paragraphs of this Complaint as if fully rewritten herein.

131.   Plaintiff brings this Count on behalf of the Nationwide Class and on behalf of the State Subclass as defined separately if a Nationwide Class is not certified.

132.   As a result of Defendants' unlawful and deceptive actions described above, Defendants were enriched at the expense of Plaintiff and the Class.

133.   Defendants' failure to provide a product commensurate with the benefits conferred upon Defendants was detrimental to Plaintiff and members of the Classes.

134.   Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits it received from Plaintiff and Class Members.

135.   It would be unjust and inequitable for Defendants to retain the benefit without restitution to Plaintiff and the Class for the monies paid to Defendants for the Defective Vehicle.

## COUNT IV
## VIOLATION OF THE RACKETEER INFLUENCED AND
## CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1962(C)
## (ON BEHALF OF THE NATIONWIDE AND SUBCLASSES)

136.   Plaintiff incorporates all other paragraphs of this Complaint as if fully rewritten herein.

137.   Plaintiff brings this Count on behalf of the Nationwide Class and on behalf of the Subclass(es) as defined separately if a Nationwide Class is not certified.

138.   The Volkswagen Defendants are "persons" under 18 U.S.C. § 1961(3).

139.   The Volkswagen Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the Volkswagen RICO Enterprise through a pattern of racketeering activity.

140.   Plaintiff and Class members are "person[s] injured in her or her business or property" by reason of the Volkswagen Defendants' violation of RICO within the meaning of 18 U.S.C. § 1964(c).

### *THE VOLKSWAGEN RICO ENTERPRISE*

141.   The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, the "Volkswagen RICO Enterprise":

> a.   Volkswagen AG, who designed, manufactured, and sold hundreds of thousands of Defective Vehicles knowing that they contained the illegal defeat devices, the scope and nature of which they concealed from and misrepresented to the public and regulators for more than a decade and still refuse to entirely acknowledge.

b.     Volkswagen AG's Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates in fact in the Volkswagen RICO Enterprise to deceive Plaintiff and Class Members into purchasing defective vehicles, and actively concealing the illegal defeat devices from Plaintiff and Class Members.

c.     Volkswagen Group of America, who designed, manufactured, and sold hundreds of thousands of Defective Vehicles knowing that they contained the illegal defeat devices, the scope and nature of which they concealed from and misrepresented to the public and regulators for more than a decade and still refuse to entirely acknowledge.

d.     Volkswagen Group of America's Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates in fact in the Volkswagen RICO Enterprise to deceive Plaintiff and Class Members into purchasing defective vehicles, and actively concealing the illegal defeat devices from Plaintiff and Class Members.

e.     Dealerships that sell vehicles manufactured by the Vehicle Manufacturer Defendants, which sold or leased the Defective Vehicles containing illegal defeat devices to Plaintiff and Class Members.

142.   The Volkswagen RICO Enterprise, which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common purpose.

143.   The Volkswagen RICO Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

144.   While the Volkswagen Defendants participated in the conduct of the Volkswagen RICO Enterprise, they had an existence separate and distinct from the Volkswagen RICO Enterprise.

145.   The Volkswagen RICO Enterprise was separate and distinct from the pattern of racketeering in which the Volkswagen Defendants have engaged.

146.   At all relevant times, the Volkswagen Defendants operated, controlled or managed the Volkswagen RICO Enterprise, through a variety of actions.

147.   The Volkswagen Defendants' participation in the Volkswagen RICO Enterprise was necessary for the successful operation of its scheme to defraud because the Volkswagen Defendants manufactured the Defective Vehicles, concealed the nature and scope of the defeat devices, and profited from such concealment.

148.   The members of the Volkswagen RICO Enterprise all served a common purpose: to sell as many Defective Vehicles as possible to maximize the revenue and profitability of the Volkswagen RICO Enterprise's members.

149. The members of the Volkswagen RICO Enterprise shared the bounty generated by the enterprise by, for example, sharing the benefit derived from increased sales revenue generated by the scheme to defraud.

150. Each member of the Volkswagen RICO Enterprise benefited from the common purpose: the Volkswagen Defendants sold more Defective Vehicles than they would have otherwise had the scope and nature of the defeat devices not been concealed; the dealerships sold and serviced more Defective Vehicles, and sold or leased those vehicles at a much higher price, as a result of the concealment of the scope and nature of the defeat devices from Plaintiff and Class Members.

## *PATTERN OF RACKETEERING ACTIVITY*

151. The Volkswagen Defendants conducted and participated in the conduct of the affairs of the Volkswagen RICO Enterprise through a pattern of racketeering activity, beginning no later than 2009 and continuing to this day, that consists of numerous and repeated violations of the federal mail and wire fraud statutes. These statutes prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

152. For the Volkswagen Defendants, the purpose of the scheme to defraud was to conceal the scope and nature of the illegal defeat devices found in hundreds of thousands of Defective Vehicles worldwide in order to sell more vehicles, to sell them at a higher price or for a higher profit, and to avoid incurring the expenses associated with repairing the defects. By concealing the scope and nature of the illegal defeat devices in the Defective Vehicles, the Volkswagen Defendants also maintained and boosted consumer confidence in the "clean diesel" campaign, and avoided remediation costs and negative publicity, all of which furthered the scheme to defraud and helped the

Volkswagen Defendants sell more vehicles than they would otherwise have sold, and to sell them at a much higher price or for a higher profit.

153.    The Volkswagen Defendants were well aware of the defeat devices, but intentionally subjected Plaintiff and Class Members to those defects in order to maximize their profits. Once government regulators revealed the defect, the Volkswagen Defendants failed to adequately remedy the defect.

154.    To further the scheme to defraud, the Volkswagen Defendants repeatedly misrepresented and concealed the nature and scope of the defeat devices defect. The Volkswagen Defendants passed off a substandard recall but failed to adequately remedy the nature of the defect.

155.    To further the scheme to defraud, the Volkswagen Defendants concealed the nature and scope of the defeat devices defect from federal regulators, enabling it to escape investigation and costs associated with recalls and corrective action.

156.    To further the scheme to defraud, the Volkswagen Defendants would promote and tout the reliability, and quality of the vehicles while simultaneously concealing the nature and scope of the defeat devices defect.

157.    To further the scheme to defraud, the Volkswagen Defendants permitted or caused the Dealerships to promote the reliability, and quality of the purported eco-friendly nature of the Defective Vehicles while simultaneously concealing the nature and scope of the defeat devices defect.

158.    To carry out, or attempt to carry out the scheme to defraud, the Volkswagen Defendants have conducted or participated in the conduct of the affairs of the Volkswagen RICO Enterprise through the following pattern of racketeering activity

that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

    a.   The Volkswagen Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including the Volkswagen website, communications with the EPA and/or CARB statements to the press, and communications with other members of the Volkswagen RICO Enterprise, as well as advertisements and other communications to the Volkswagen Defendants' customers, including Plaintiff and Class members.  Given that each Defective Vehicle required a COC application, the Volkswagen Defendants used the mail and wires 30 times, at minimum, to submit the fraudulent COC applications; and

    b.   The Volkswagen Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations.

159.  The Volkswagen Defendants' pattern of racketeering activity in violation of the mail and wire fraud statutes included transmitting or causing to be transmitted, by means of mail and wire communication traveling in interstate or foreign commerce, between its offices in Germany, Virginia, Michigan or among the other 20-plus offices in the United States: communications concerning the illegal defeat devices; and

submissions to the EPA regarding COC applications for each model and year of the Defective Vehicles that failed to adequately disclose or address all auxiliary emission control devices that were installed in the Defective Vehicles.

160. The Volkswagen Defendants' conduct in furtherance of this scheme was intentional. Plaintiff and Class Members were directly harmed as a result of the Volkswagen Defendants' intentional conduct. Plaintiff, Class Members, and federal regulators, among others, relied on the Volkswagen Defendants' material misrepresentations and omissions.

161. The Volkswagen Defendants engaged in a pattern of related and continuous predicate acts beginning at least in 2009. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiff and Class Members and obtaining significant monies and revenues from them while providing Defective Vehicles worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

162. The predicate acts all had the purpose of generating significant revenue and profits for the Volkswagen Defendants at the expense of Plaintiff and Class Members. The predicate acts were committed or caused to be committed by the Volkswagen Defendants through their participation in the Volkswagen RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiff's and Class Members' funds and avoiding the expenses associated with remediating the defect.

163.   By reason of and as a result of the conduct of the Volkswagen Defendants, and in particular its pattern of racketeering activity, Plaintiff and Class Members have been injured in their business and/or property in multiple ways, including but not limited to:

      a.   purchasing or leasing Defective Vehicles that Plaintiff and Class Members would not otherwise have purchased or leased;

      b.   overpaying for leased or purchased Defective Vehicles, in that Plaintiff and Class Members believed they were paying for "green" eco-friendly vehicles but obtaining vehicles that were neither "green" nor eco-friendly; and

      c.   purchasing Defective Vehicles of diminished values, thus reducing their resale value.

164.   The Volkswagen Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiff and Class Members, and Plaintiff and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT V
## BREACH OF CONTRACT
## (ON BEHALF OF THE NATIONWIDE AND SUBCLASSES)

165.   Plaintiff incorporates all other paragraphs of this Complaint as if fully rewritten herein.

166.   Plaintiff brings this Count on behalf of the Nationwide Class and on behalf of the Subclass(es) as defined separately if a Nationwide Class is not certified.

167.    The Volkswagen Defendants' misrepresentations and omissions, including The Volkswagen Defendants' failure to disclose the existence of the "defeat device" and/or defective design, caused Plaintiff and the Class Members to make their purchases or leases of their Defective Vehicles. Absent those misrepresentations and omissions, Plaintiff and the Class Members would not have purchased or leased these Defective Vehicles, would not have purchased or leased these Defective Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the CleanDiesel engine system and the "defeat device."

168.    As a result, Plaintiff and the Class Members overpaid for their Defective Vehicles and did not receive the benefit of their bargain.

169.    Each and every sale or lease of a Defective Vehicle constitutes a contract between the Volkswagen Defendants and the purchaser or lessee.

170.    Plaintiff and the State Subclass Members have had sufficient direct dealings with either the Defendants or their agents to establish privity of contract between them.

171.    The Volkswagen Defendants breached these contracts by selling or leasing Plaintiff and the Class Members Defective Vehicles and by misrepresenting or failing to disclose the existence of the "defeat device" and/or defective design, including information known to the Volkswagen Defendants rendering each Defective Vehicle less safe and emissions compliant, and thus less valuable, than vehicles not equipped with CleanDiesel engine systems and "defeat devices."

172.    As a direct and proximate result of the Volkswagen Defendants' breach of contract, Plaintiff and the Class Members have been damaged in an amount to be

47

proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## STATE-SPECIFIC CAUSES OF ACTION

### COUNT VI
### BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY:
### OHIO REV. CODE ANN. § 1302.27
### (ON BEHALF OF THE STATE SUBCLASS)

173.  Plaintiff incorporates all other paragraphs of this Complaint as if fully rewritten herein.

174.  Plaintiff brings this Count on behalf of the State Subclass.

175.  The Defective Vehicles are "goods" within the meaning of Ohio Rev. Code Ann. § 1302.01(A)(8).

176.  Plaintiff and the State Subclass Members are "buyers" within the meaning of Ohio Rev. Code Ann. § 1302.01(A)(1).

177.  A warranty that goods shall be merchantable and fit for the ordinary purposes for which such goods are used is implied if the seller is a merchant with respect to goods of that kind.  Ohio Rev. Code Ann. § 1302.27.

178.  Defendants are "merchants" with respect to motor vehicles and/or their parts, including engines and emission control systems, within the meaning of Ohio Rev. Code Ann. § 1302.01(A)(5).

179.  Defendants' impliedly warranted pursuant to Ohio Rev. Code Ann. § 1302.27 that the Defective Vehicles were merchantable, which implied warranty became part of the basis of the bargain when Plaintiff and the State Subclass Members purchased or leased their Defective Vehicles.

180.  Even though not required, Plaintiff and the State Subclass Members have had sufficient direct dealings with either the Defendants or their agents to establish privity of contract between them.

181. Defendants breached this implied warranty of merchantability because, among other things, the Defective Vehicles would not have passed without objection in the automotive trade, were not fit for the ordinary purpose in which such goods are used, and were not adequately labeled in that they contained a latent defect causing the Defective Vehicles to not be roadworthy.

182. Defendants were given notice of their breach of this implied warranty, both before and after the recalls and issues relating to the Defective Vehicles became public, by their direct knowledge of the defects, and complaints received, as well as external investigations conducted by safety regulators. Defendants, however, affirmatively misrepresented and otherwise actively and fraudulently concealed the issues with the Defective Vehicles from Plaintiff and the State Subclass Members, and the public at large, such that Plaintiff and the State Subclass Members did not discover and could not have discovered with due diligence Defendants' breach of this implied warranty until their vehicles were recalled.

183. Moreover, although Defendants are now and may continue to recall the Defective Vehicles, they have refused and/or are unable and/or will be unable to meet consumer demand for non-Defective Vehicles or alternative means of transportation.

184. Pursuant to Ohio Rev. Code Ann. § 1302.88 and 1302.89(B)(2), Plaintiff and the State Subclass Members have thus sustained injuries and damages as a direct and proximate result of Defendants' breach of the implied warranty of merchantability.

**COUNT VII**
**BREACH OF EXPRESS WARRANTY:**
**OHIO REV. CODE ANN. § 1302.88**
**(ON BEHALF OF THE STATE SUBCLASS)**

185.    Plaintiff incorporates all other paragraphs of this Complaint as if fully rewritten herein.

186.    Plaintiff brings this Count on behalf of the State Subclass.

187.    The Defective Vehicles are "goods" within the meaning of Ohio Rev. Code Ann. § 1302.01(A)(8).

188.    Plaintiff and the State Subclass Members are "buyers" within the meaning of Ohio Rev. Code Ann. § 1302.01(A)(1).

189.    Defendants are "merchants" with respect to motor vehicles and/or their parts, including airbags, within the meaning of Ohio Rev. Code Ann. § 1302.01(A)(5).

190.    Defendants expressly warranted pursuant Ohio Rev. Code Ann. § 1302.26 that the Defective Vehicles were merchantable, which express warranty was part of the basis of the bargain when Plaintiff and the State Subclass Members purchased or leased their Defective Vehicles.

191.    Plaintiff and the State Subclass Members reasonably expected and relied upon Defendants' express warranty when purchasing or leasing the Defective Vehicles, which express warranty became a basis of the bargain of such sale or lease transaction.

192.    Defendants breached this express warranty because, among other things, the Defective Vehicles were not fit for the ordinary purpose in which such goods are used, contained a defect causing the Defective Vehicles to not be roadworthy under Federal, State, and Local laws and regulations, the Defective Vehicles would not have

51

passed without objection in the automotive trade, and were not adequately labeled in that they contained a latent defect causing the Defective Vehicles to not be roadworthy.

193. Defendants were given notice of their breach of this express warranty, both before and after the recalls and issues relating to the Defective Vehicles became public, by their direct knowledge of the defects, and complaints received, as well as external investigations conducted by safety regulators. Defendants, however, affirmatively misrepresented and otherwise actively and fraudulently concealed the issues with the Defective Vehicles from Plaintiff and the State Subclass Members, and the public at large, such that Plaintiff and the State Subclass Members did not discover and could not have discovered with due diligence Defendants' breach of this express warranty until their vehicles were recalled.

194. Moreover, although Defendants are now and may continue to recall the Defective Vehicles, they have refused and/or are unable and/or will be unable to meet consumer demand for non-Defective Vehicles or alternative means of transportation.

195. Pursuant to Ohio Rev. Code Ann. § 1302.88 and 1302.89(B)(2), Plaintiff and the State Subclass Members have thus sustained injuries and damages as a direct and proximate result of Defendants' breach of the express warranty.

**COUNT VIII**
**OHIO CONSUMER SALES PRACTICES ACT**
**OHIO REV. CODE ANN. § 1345.01, ET SEQ**
**(ON BEHALF OF THE STATE SUBCLASS)**

196. Plaintiff incorporates all other paragraphs of this Complaint as if fully rewritten herein.

197. Plaintiff brings this Count on behalf of the State Subclass.

198.   This claim is brought pursuant to R.C. § 1345.01, *et seq.*, commonly referred to as the Ohio Consumer Sales Practices Act ("CSPA"), on behalf of the Plaintiff and the State Subclass Members.

199.   At all times relevant hereto, Plaintiff and the State Subclass Members were/are "consumers" as defined by R.C. § 1345.01(D), each of whom engaged in consumer transactions with the Volkswagen Defendants.

200.   At all times relevant hereto, the Volkswagen Defendants and/or their agents were "suppliers" as defined by R.C. § 1345.01(C) in that they solicited and/or effected consumer transactions with Plaintiff and the State Subclass Members.

201.   The acts of with the Volkswagen Defendants as complained of herein are, by virtue of R.C. § 1345.05 and R.C. § 1345.09, acts that have been found to be unfair and deceptive by competent courts of Ohio and have been held available for public inspection by the Attorney General of Ohio and/or have been incorporated into the Ohio Administrative Code as unfair and deceptive.  These acts include, but are not limited to, failure to honor express warranties.  *See, e.g., Brown v. Lyons* (1974), 43 Ohio Misc. 14, 332 N.E.2d 380, Ohio Attorney General Public Inspection File No. 10000304; *Celebrezze v. Moore* (April 30, 1987), No. 86CV-02-1297, Ohio Attorney General Public Inspection File No. 10000851.

## PRAYER FOR RELIEF

Plaintiff, on behalf of himself and all others similarly situated, requests the Court to enter judgment against the Defendants, as follows:

a. An order certifying the proposed Classes designating Plaintiff as named representative of the Classes, and designating the undersigned as Class Counsel;

b. A declaration that the Defective Vehicles are defective;

c. A declaration that the Defendants are financially responsible for notifying all Class Members about the defective nature of the Defective Vehicles;

d. An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Defective Vehicles, and directing Defendants to permanently, expeditiously, and completely repair the Defective Vehicles to eliminate the illegal defeat devices;

e. An award to Plaintiff and Class Members of compensatory, exemplary, and statutory penalties, damages, including interest, in an amount to be proven at trial;

f. An award to Plaintiff and Class Members for the return of the purchase prices of the Defective Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

g. A declaration that the Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Defective Vehicles, or make full restitution to Plaintiff and Class Members;

h. A declaration by the Court, pursuant to Ohio Revised Code 1345.09(D), that the Defendants' actions constitute an unfair, deceptive, or unconscionable business practice under Ohio's Consumer Sales Practices Act, R.C. § 1345.01, et seq.;

i. An award of attorneys' fees and costs, as allowed by law;

j. An award of prejudgment and post-judgment interest, as provided by law;

k.  Leave to amend this Complaint to conform to the evidence produced at trial; and

l.  Such other and further relief as the Court deems appropriate under the circumstances.

**<u>A TRIAL BY JURY IS HEREBY DEMANDED.</u>**

Dated: September 24, 2015

/s/ Stuart E. Scott
DENNIS R. LANSDOWNE (0026036)
STUART E. SCOTT (0064834)
NICHOLAS A. DICELLO (0075745)
WILLIAM B. EADIE (0085627)
**SPANGENBERG SHIBLEY & LIBER LLP**
1001 Lakeside Avenue East, Suite 1700
Cleveland, Ohio  44114
(216) 696-3232 | (216) 696-3924 (FAX)
dlansdowne@spanglaw.com
sscott@spanglaw.com
ndicello@spanglaw.com
weadie@spanglaw.com
www.spanglaw.com

***Counsel for Plaintiff***